copyright in the Stock Footage, which was granted on November 18, 2004 ("Second Preliminary Injunction"). PIP's appeal of the Second Preliminary Injunction was unsuccessful; the Ninth Circuit affirmed on July 11, 2005.

14.     On or about February 28, 2007, the Court entered a Permanent Injunction against PIP's marketing and distribution of the Program and dismissed the Underlying Action with prejudice, pursuant to the parties' stipulation.

15.     On April 26, 2006, all of PIP's assets, including all existing claims and causes of action, were purchased at a foreclosure auction by Florence Pugliese.

16.     On April 26, 2006, Florence Pugliese assigned and transferred the PIP Assets to PASSPORT.

17.     As of April 26, 2006, all of the claims and causes of action asserted in this Complaint had accrued.

18.     By virtue of the Florence Pugliese foreclosure purchase and assignment, PASSPORT is the successor in interest to all of the claims and causes of actions asserted against HISTORIC in this Complaint.

## FIRST CLAIM FOR RELIEF
(Breach of Written Contract)

19.     PASSPORT hereby realleges and incorporates by reference paragraphs 1 through 18, inclusive, as though fully set forth herein.

Exhibit A
Page 8

20.     Pursuant to the Agreement and the Rider, HISTORIC represented and warranted that it had the rights in the Stock Footage which it had licensed to PIP, and that those rights specifically included the "underlying visual images and audio sound recordings (including live musical performances) incorporated into the Stock Footage" (the "Rights").

21.     PASSPORT is informed and believes, and thereupon alleges, that HISTORIC did not own the Rights when it licensed them to PIP.    Accordingly, HISTORIC is in breach of the Agreement.

22.     PIP performed all of its obligations under the Agreement, except to the extent said performance has been excused, frustrated or made impossible by HISTORIC's wrongful conduct.

23.     As a direct and proximate result of Defendant's aforesaid breach of the Agreement, PIP suffered both direct and consequential damages, was forced to incur substantial legal fees and costs in the Underlying Action and suffered significant losses due to its inability to market and distribute the Program. Accordingly, PASSPORT has been damaged in an amount which will be established according to proof at trial, but in no event less than $1,000,000, plus interest at the maximum rate permissible by law.

## SECOND CLAIM FOR RELIEF
(Express Indemnity)

24.     PASSPORT hereby realleges and incorporates by reference paragraphs 1 through 23, inclusive, as though fully set forth herein.

25.     Pursuant to the Agreement, HISTORIC agreed to indemnify and hold harmless PIP for any third-party claims "of unauthorized use of any rights arising from exploitation of the Stock Footage" ("Claims"). The Underlying Action represents such

Claims. However, although PIP notified HISTORIC of the Claims, HISTORIC has

expressly rejected PIP's contention that said claims constitute a breach of HISTORIC's

representations and warranties to PIP under the Agreement.

26.    PIP was forced to incur substantial legal fees and costs in the Underlying

Action and suffered significant losses due to its inability to market and distribute the

Program. Accordingly, PASSPORT is entitled to be expressly indemnified by HISTORIC

for the ALL damages PIP suffered, in an amount to be proved at trial, but in no event less

than $1,000,000, plus interest at the maximum rate permissible by law.

### THIRD CLAIM FOR RELIEF
(Implied Indemnity)

27.    PASSPORT hereby realleges and incorporates by reference paragraphs 1

through 26, inclusive, as though fully set forth herein.

28.    PASSPORT has been damaged as described herein above based on

HISTORIC's breach of the Agreement.   If, for whatever, reason, it is determined that

HISTORIC does not have an express contractual obligation to indemnify and hold

harmless PASSPORT from all damages arising from the Claims asserted in the

Underlying Action due to HISTORIC's breach of its representations and warranties with

respect to the Stock Footage, then HISTORIC nevertheless has an implied obligation to

indemnify PASSPORT therefore.

29.    PIP was forced to incur substantial legal fees and costs in the Underlying

Action and suffered significant losses due to its inability to market and distribute the

Program. Accordingly, PASSPORT is entitled to be impliedly indemnified by

HISTORIC for ALL damages PIP suffered, in an amount to be proved at trial, but in no

event less than $1,000,000, plus interest at the maximum rate permissible by law.

7

Exhibit A

Page 10

WHEREFORE, PASSPORT prays for relief as follows:

ON THE FIRST, SECOND AND THIRD CLAIMS FOR RELIEF:

1.    Damages according to proof, but no less than $1,000,000;

2.    Interest at the maximum rate permissible by law.

3.    PASSPORT's attorney's fees and costs of suit herein;

4.    For such other relief as the Court deems just and proper.

DATED: October 31, 2007

                        Respectfully Submitted,
                        CAPLAN & ROSS, LLP

By: _____
                      Brian D. Caplan (BC-1713)
                      Jonathan J. Ross (JR-0581)
100 Park Avenue
New York, NY 10017
Telephone:    (212) 973-2376
Fax:             (212) 661-4290

                  -and-

Michael R. Blaha, Esq.
 (*pro hac vice* Application Pending)
Law Offices of Michael R. Blaha
2530 Wilshire Boulevard, Third Floor
Santa Monica, California  90403
Telephone:    (310) 828-4847
Fax:             (310) 828-4153

Attorneys for Plaintiff,
Passport International Entertainment, LLC

8

# Exhibit A



### 211 THIRD STREET, GREENPORT, NEW YORK 11944

## STOCK FOOTAGE LICENSE AGREEMENT

DATE:            JUNE 26, 2003                    **JOB #: 11948K**

LICENSOR:        **HISTORIC FILMS ARCHIVE, LLC**
ADDRESS:         **211 THIRD STREET**
                 **GREENPORT, NEW YORK 11944**

LICENSEE:        **PASSPORT PRODUCTIONS**
ADDRESS:         **10520 MAGNOLIA BOULEVARD**
                 **NORTH HOLLYWOOD, CALIFORNIA 91601**

1. **STOCK FOOTAGE INVOLVED** (hereinafter the "Stock Footage"):
   **KISS PERFORMANCE FOOTAGE**

2. **PRODUCTION IN WHICH STOCK FOOTAGE TO BE USED** (hereinafter
   the "Production"):  **THE KISS VAULT**

3. **PERMITTED USAGE OF STOCK FOOTAGE:**

   A. Number of uses permitted:           UNLIMITED

   B. Total length of permitted usage:    UP TO 7 SONGS

   C. Media in which use permitted:       ALL HOME VIDEO

   D. Terms for which use permitted:      IN PERPETUITY

   E. Territories in which use permitted: WORLDWIDE

   F. Other limitations on permitted uses: NONE

4. **LICENSE FEE:** Licensee shall pay to Licensor a fee in the sum of **$20,000.00** which
   shall become due and payable within thirty (30) days of the date of this Agreement, and
   further agrees that **100%** of said fee shall in all events be payable to Licensor as a
   cancellation fee whether or not Licensee uses the Stock Footage as contemplated herein
   in order to compensate Licensor for costs of compiling, copying, researching, etc.

## HISTORIC FILMS ARCHIVE, LLC
### 631-477-9700 ∎ fax: 631-477-9800 ∎ www.historicfilms.com ∎ info@historicfilms.com

Exhibit _____ A
Page _____ 13

**5. LICENSE GRANTED:** In consideration of payment of the license fee, Licensor hereby grants to Licensee, without warranty except as expressly stated herein, a limited, non-exclusive, non-transferable license to use the Stock Footage, subject to the terms and conditions specified herein, and as follows:

      **A.** Licensee hereby expressly agrees that the Stock Footage shall be used only for the permitted purposes as set forth in paragraphs 2 and 3, above, and for no other purpose;

      **B.** Licensee shall not permit the Stock Footage to be made available to or to be used by any other party not expressly contemplated herein at any time or in any manner other than as provided for in this Agreement;

      **C.** Licensee shall accord Licensor a prominent courtesy credit for the use of the Stock Footage on the title cards of the Production in a manner equal in all respects to any other courtesy credits which licensee may accord to others in the Production;

      **D.** Licensee agrees, at its sole expense, to promptly return to Licensor all pre-print material, negatives, dupes, fine grain masters, video tape masters, and all other production or physical materials containing the Stock Footage after the completion of editing of the Production;

      **E.** Licensee shall, at its sole expense, provide to Licensor a VHS or DVD of the completed final version of the Production before Licensee releases the Production for broadcast;

      **F.** Licensee agrees to pay all laboratory, duplication, transportation and other related costs which may be involved in producing and delivering the Stock Footage, and further agrees to return the original Stock Footage to Licensor within ninety (90) days of the date of this Agreement.

      **G.** Licensor agrees to withhold its own home video release of the entire program the Footage is being excerpted from, as well as the sublicensing of the entire program to third parties for home video release (Historic Films reel number ME- 130) for one (1) year beginning with the date of this Agreement. This does not include Licensor's ability to license to third parties clips or excerpts taken from ME-130 (the Footage).

**6. LIMITED LICENSE:** With respect to the License granted hereunder, it is expressly understood and acknowledged by Licensee that:

      **A.** Any rights, title or interest which the Licensor maintains with respect to the Stock Footage are expressly reserved by Licensor, subject only to the limited rights under the license as granted hereunder;

Exhibit __A__

Page __14__

B.  Licensor warrants only that it has the right to grant this License with respect to the copyright of the Stock Footage and agrees to indemnify and to hold Licensee harmless only to the extent of any third-party claims for infringement of any motion picture copyright or any other claims of unauthorized use of any rights arising from exploitation of the motion picture footage as expressly authorized herein.  In the event that such claims are made against Licensee, Licensee must immediately notify Licensor in writing regarding the details of such claims, and permit Licensor, at its sole option and discretion, to assume the responsibility for control and the defense of any litigation, including but not limited to all aspects of settlement, compromise, etc.

**7.  LICENSEE'S ACKNOWLEDGMENTS AND INDEMNIFICATION:**  Licensee expressly represents and acknowledges that:

A.  Licensee's contemplated use of the Stock Footage may require other consents, clearances, releases or licenses from parties other than Licensor, and Licensee hereby agrees to be solely responsible for obtaining all such necessary consents, clearances, releases or licenses and for making all payments required thereunder to any union, guild, actor, writer, composer, musician, producer, director or any other person or entity whose performances have been recorded in or who have performed services in connection with the Stock Footage;

B.  Licensee is solely responsible for the matters set forth in subparagraph 7(A), above, and hereby agrees to indemnify and to hold Licensor (and its agents, employees, representatives, affiliates, parent and subsidiary corporations, each and all of them) harmless against any and all actions, claims, costs (including reasonable attorneys' fees), damages, demands and expenses brought against, suffered or incurred by Licensee as the result of any breach or non-observance of any of the obligations set forth in subparagraph 7(A), above;

C.  The terms of the indemnification set forth in subparagraph 7(B) above, shall apply to all loss, cost, damage, liability or expense of any kind arising from claims of defamation, commercial disparagement or other actionable wrong committed by Licensee in connection with the Production.

**8.  LICENSE TERMINATION:**  Upon the expiration of the license period set forth in paragraph 3 above, or upon termination of this Agreement for whatever cause, all of Licensee's rights and entitlements granted hereunder shall immediately cease and the license granted hereunder shall immediately revert to Licensor.  The termination of this Agreement for whatever cause shall not cancel or release any indebtedness of the Licensee to the Licensor.

**9.  MISCELLANEOUS:**

A.  Nothing in this Agreement or in the license conveyed hereunder shall be deemed to constitute a partnership or joint venture between the parties, and neither party

3

shall do or permit any act to be done whereby it may be represented as agent or partner of the other;

B. This Agreement is personal to and for the sole benefit of the Licensee and the Licensee shall not be entitled to assign, transfer, license, sell or dispose in any way of any of its rights, interests or obligations under this Agreement to any third party;

C. No waiver (whether express or implied) by Licensor of any breach by the Licensee of any of its obligations hereunder shall be deemed to constitute a waiver or consent to any subsequent or continuing breach by the Licensee of any such obligations;

D. In the event that Licensee fails to make timely payment of any fee or costs payable to Licensor, Licensor shall have the right without prejudice to any other right or remedy to charge Licensee from the date that payment fell due until payment is paid in full, interest on the outstanding indebtedness to be calculated at the rate of four (4%) per cent per annum above the base rate as stated by Citibank, N.A. for the applicable time compounded at monthly intervals;

E. Licensee expressly acknowledges that its failure to comply with any of the terms and conditions of this Agreement will render this Agreement and the license conveyed thereunder null and void ab initio, and that a breach by Licensee of any of its representations, warranties or undertakings herein will cause Licensor irreparable damage which cannot readily be remedied in monetary damages in an action at law and may, in addition thereto, constitute an infringement of copyright, thereby entitling Licensor to all equitable remedies, costs and attorneys' fees;

F. This Agreement shall be interpreted in accordance with the laws of the State of New York and will be subject to the exclusive jurisdiction of the courts, state and federal, located within the State of New York to which the parties hereby submit in relation to any dispute arising hereunder;

G. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof, and any amendments, changes or modifications shall have legal effect and be binding only if made in writing and signed by both parties.

HISTORIC FILMS ARCHIVE, LLC.          PASSPORT PRODUCTIONS

By: _____ 7-22-03        By: _____ 7/25/03
    Joe Lauro, President    Date         Its Representative      Date

4

Exhibit A
Page 16

# Exhibit B

PASSPORT PRODUCTIONS

## facsimile transmittal

| To: | Kevin | Fax: | 631-477-9800 |
|---|---|---|---|
| From: | Anthony Mercaldi | Date: | 8/13/2003 |
| Re: | Kiss Performance Footage License | Pages: | 1 |
| CC: | | | |

☐ Urgent      ☐ For Review      ☐ Please Comment      ☐ Please Reply      ☐ Please Recycle

Dear Kevin,

This is to confirm our conversation of earlier today concerning the Kiss License wherein you advised me that the license includes the live audio recording of the performance (as long as the performance was not lip synched.)

If you have any questions, please feel free to contact me at 818-760-1500

Thanks for your help.

Anthony Mercaldi

CONFIDENTIAL

# Exhibit C

Anthony Mercaldi
Passport International Productions
10520 Magnolia Blvd.
North Hollywood, CA
818-613-3035

# facsimile transmittal

| To: | Kevin | Fax: | 631-477-9800 |
|---|---|---|---|
| From: | Anthony Mercaldi | Date: | 9/4/2003 |
| Re: | Kiss Performance Footage License | Pages: | 9 |
| CC: | Danny Pugliese, Herb Dorfman, and Howard Balsam | | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Please accept this as a follow-up to our telephone conference of 8/13/03 and my confirmation fax to your attention of the same date. As you may recall, I contacted you to verify that the license that I secured from Historic Films concerning the Kiss Performance Footage (to follow for your review) included the underlying rights in the live performance itself, including all musical sound recordings (not including music composition rights.) This afternoon, we received a fax from our distributor advising us that they do not believe that the license from Historic actually conveys these rights to Passport (correspondence to follow for your review.)

Please contact me at your earliest convenience to discuss this matter in greater detail. If Historic Films is in possession of any documents that we may provide to our distributor to assure them that Passport has the performance rights incorporated in the audio-visual work (the footage), please provide me with copies at your earliest convenience. Passport is operating under a strict deadline

Exhibit A
Page 20

for its Kiss DVD, and relied on the assurances of Historic Films that it possessed the rights

Historic Films represented that it licensed.


I can be reached at 818-760-1500. Please get back to me at your earliest convenience to clarify

this matter.


Sincerely,

Anthony Mercaldi

# Exhibit D

01:57p    H    HRIC FILMS              631  77 9800        P-1
2003 16:51   8197601632              PASSPORT INT'L PR...        PAGE 06/06

### Rider to "Stock Footage License Agreement"

Licensor acknowledges that the Stock Footage includes the underlying visual images and audio sound recordings (including the live musical performances) incorporated into the Stock Footage, excluding any pre-recorded music or vocals that may have been synched or lip-synched into the live performance, and that Licensor warrants that it has the right to grant a license with respect to the copyright in the Stock Footage as herein further defined. Licensee acknowledges that this grant does not extend to any copyrights in the music compositions of the underlying songs, and that Licensee has the responsibility to obtain any and all synchronization and videogram licenses from the copyright holders of the music composition rights at licensee's own expense.

The above provision is not intended in any way to modify, alter, or change any terms or obligations in the Agreement, but rather to clarify the terms and to more accurately reflect the understanding of Passport and Historic Films.

Dated: September 8, 2003

By: _____
Jeanette Bogliese, VP
Passport International Productions

Dated: September 9, 2003

By: _____
Joe Lauro, President
Historic Films Archive, LLC.

Post-It® Fax Note  7671  Date 9/9/03  # of pages ►
To Anthony Morabito     From Kevin Rice
Co./Dept.               Co.
Phone #                 Phone # 631 477 9400
Fax # 818 7601532       Fax # 9800

## CERTIFICATE OF SERVICE

I, Jonathan J. Ross, hereby certify that on October 31, 2007, I caused to be served a true and

correct copy of the within First Amended Complaint by ECF filing and First Class Mail upon the

following:

>   David M. Levy
>   Levy & Boonshoft, P.C.
>   477 Madison Avenue, 14th Floor
>   New York, New York 10022
>   Attorneys for Defendant
>   Historic Films Archive, LLC

Dated: October 31, 2007
      New York, New York

                                   Jonathan J. Ross (JR 0581)

ECF

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:07-cv-08194-VM

| | |
|---|---|
| Passport International Entertainment, LLC v. Historic Films Archive, LLC<br>Assigned to: Judge Victor Marrero<br>Demand: $1,000,000<br>Cause: 28:1332 Diversity-Breach of Contract | Date Filed: 09/19/2007<br>Jury Demand: None<br>Nature of Suit: 190 Contract: Other<br>Jurisdiction: Federal Question |

**Plaintiff**

**Passport International<br>Entertainment, LLC**<br>*a California Limited Liability Company*

represented by **Brian D. Caplan**<br>Caplan & Ross,LLP<br>100 Park Avenue<br>18th Floor<br>New York, NY 10017<br>(212) 973-2376<br>Fax: (212) 661-4290<br>Email: bcaplan@caplanross.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*

**Michael R. Blaha**<br>Caplan & Ross, LLP<br>2350 Wilshire Boulevard<br>Third Floor<br>Santa Monica, CA 90403-4642<br>(212) 973-2376

V.

**Defendant**

**Historic Films Archive, LLC**<br>*a New York Limited Liability Company*

represented by **David M. Levy**<br>Levy & Boonshoft. P.C.<br>477 Madison Avenue<br>NY, NY 10022<br>(212) 751-1414<br>Fax: (212) 751-6943<br>Email: dlevy@levyboonshoft.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| | | |

Exhibit __A__

Page __25__

| 09/19/2007 | 1 | COMPLAINT against Historic Films Archive, LLC. (Filing Fee $ 350.00, Receipt Number 627398)Document filed by Passport International Entertainment, LLC.(jeh) Additional attachment(s) added on 9/24/2007 (Becerra, Maribel). (Entered: 09/20/2007) |
| 09/19/2007 | | SUMMONS ISSUED as to Historic Films Archive, LLC. (jeh) (Entered: 09/20/2007) |
| 09/19/2007 | | Case Designated ECF. (jeh) (Entered: 09/20/2007) |
| 09/19/2007 | | Magistrate Judge Debra C. Freeman is so designated. (jeh) (Entered: 09/20/2007) |
| 09/19/2007 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Passport International Entertainment, LLC. (jeh) Additional attachment(s) added on 9/24/2007 (Becerra, Maribel). (Entered: 09/20/2007) |
| 09/28/2007 | 3 | AFFIDAVIT OF SERVICE. Historic Films Archive, LLC served on 9/25/2007, answer due 10/15/2007. Service was accepted by Joel Lauro, President. Document filed by Passport International Entertainment, LLC. (Caplan, Brian) (Entered: 09/28/2007) |
| 10/16/2007 | 4 | STIPULATION AND ORDER that defendant's time to answer, move or otherwise respond with respect to the summons and complaint in this action is hereby extended through and including 11/15/07, and it is further stipulated and agreed that defendant hereby waives any challenge to the Court's jurisdiction or as to the SDNY being the proper venue. (Signed by Judge Victor Marrero on 10/16/07) (dle) (Entered: 10/16/2007) |
| 10/18/2007 | 5 | NOTICE OF APPEARANCE by David M. Levy on behalf of Historic Films Archive, LLC (Levy, David) (Entered: 10/18/2007) |
| 11/01/2007 | 6 | AMENDED COMPLAINT amending 1 Complaint against Historic Films Archive, LLC. Document filed by Passport International Entertainment, LLC. Related document: 1 Complaint filed by Passport International Entertainment, LLC. (jco) Additional attachment(s) added on 11/8/2007 (Correa, Julie). (Entered: 11/05/2007) |
| 11/01/2007 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney Brian D. Caplan for noncompliance with Section (3) of the S.D.N.Y. 3rd Amended Instructions For Filing An Electronic Case or Appeal and Section 1(d) of the S.D.N.Y. Procedures For Electronic Case Filing. E-MAIL the PDF for Document 6 Amended Complaint to: case_openings@nysd.uscourts.gov. (jco) (Entered: 11/05/2007) |
| 11/01/2007 | 7 | MOTION for Michael R. Blaha to Appear Pro Hac Vice. Document filed by Passport International Entertainment, LLC. (jco) (Entered: 11/05/2007) |
| 11/15/2007 | | CASHIERS OFFICE REMARK on 7 Motion to Appear Pro Hac Vice in the amount of $25.00, paid on 11/01/2007, Receipt Number 631618. (jd) (Entered: 11/15/2007) |

Exhibit A

Page 26

| | | |
|---|---|---|
| 11/19/2007 | 8 | MEMO ENDORSED ON NOTICE OF MOTION FOR LEAVE TO APPEAR PRO HAC VICE: ENDORSEMENT: Request GRANTED. Attorney Michael R. Blaha is authorized to appear pro hac vice as counsel for plaintiff in this action before this Court. (Signed by Judge Victor Marrero on 11/19/07) (js) (Entered: 11/20/2007) |
| 11/19/2007 | | Transmission to Attorney Admissions Clerk. Transmitted re: 8 Memo Endorsement,, to the Attorney Admissions Clerk for updating of Attorney Information. (js) (Entered: 11/20/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/04/2007 15:43:20 | | | |
| **PACER Login:** | rb2609 | **Client Code:** | 99995.000 |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-08194-VM |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

Exhibit A

Page 27

## PROOF OF SERVICE

STATE OF CALIFORNIA)
COUNTY OF LOS ANGELES)

    I am employed in the county of Los Angeles State of California. I am over the age of 18 and not a party to the within action; my business address is: 1055 W. 7th Street, Suite 2820; Los Angeles, CA 90017.

    On **December 5, 2007**, I served the foregoing document(s) described as:

- **DECLARATION OF DAVID M. LEVY IN SUPPORT OF JUDGMENT CREDITORS' MOTION TO AMEND JUDGMENT TO ADD PASSPORT ENTERTAINMENT, LLC AS AN ADDITIONAL JUDGMENT DEBTOR** on the interested parties in this action.

[X]    By placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| Michael R. Blaha, Esq.<br>Law Offices of Michael R. Blaha<br>2530 Wilshire Boulevard, Third Floor<br>Santa Monica, CA 90403 | Allen Hyman, Esq.<br>Law Offices of Allen Hyman<br>10737 Riverside Drive<br>North Hollywood, CA 91602 |
| George R. Hedges<br>Quinn Emanuel Urquhart Oliver & Hedges<br>865 S. Figueroa St., 10th Floor<br>Los Angeles, CA 90017 | |

[X]    **BY MAIL:** I placed such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

    As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on **December 5, 2007**, at Los Angeles, California.

[X]    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

LYNETTE W. SUKSNGUAN
Type or Print Name

Signature

1  ALLEN HYMAN, ESQ. (CBN: 73371)
   CHRISTINE COVERDALE, ESQ. (CBN: 195635)
2  LAW OFFICES OF ALLEN HYMAN
   10737 Riverside Drive
3  North Hollywood, California 91602
   (818) 763-6289 or (323) 877-3405
4  Fax: (818) 763-4676
   Email: lawoffah@aol.com
5
   Attorneys for Respondent,
6  PASSPORT INTERNATIONAL ENTERTAINMENT, LLC

7

8                    UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11
   ELVIS PRESLEY ENTERPRISES, INC., )  Case No. CV 02-7042 RSWL (RZx)
12 et al.,                          )
                                    )  OPPOSITION TO PLAINTIFFS'
13            Plaintiffs,           )  MOTION TO AMEND JUDGMENT TO ADD
                                    )  PASSPORT INTERNATIONAL
14 v.                               )  ENTERTAINMENT LLC
                                    )
15 PASSPORT ENTERTAINMENT, a        )  Date:  December 13, 2007
   California Corporation, et al.,  )  Time:  10:00 a.m.
16                                  )  Place: Courtroom 21, the
                                    )         Honorable U.S. District
17            Defendants.           )         Court Judge Ronald S.W.
                                    )         Lew, presiding
18 _____  )

19

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . 2

      Procedural History of This Docket  . . . . . . . . . 2

      The UCC Florence Pugliese Perfected Secured
      Creditor Interest And Foreclosure Sale . . . . . . . 3

      The JCS' Assertion of Successor Corporate
      Liability . . . . . . . . . . . . . . . . . . . . . 5

      The Motion Should (Must) Be Denied . . . . . . . . . 6

      The Passport Balance Sheet And
      Income Statement . . . . . . . . . . . . . . . . . . 9

      Constitutional Deficiency  . . . . . . . . . . . . . 10

II.   THE NINTH CIRCUIT'S HOLDING IN KATZIR'S FLOOR
      AND HOME DESIGN INC., V. M-MLS.COM.,
      394 F.3D 1143 (9TH CIR., 2004), IS CONTRARY
      TO THE JCS' MOTION . . . . . . . . . . . . . . . . . 11

      Sale Of Assets Of PASSPORT-CA . . . . . . . . . . . 15

      Further Basis Consistent With Ninth Circuit
      Decision In M-MLS, supra . . . . . . . . . . . . . . 15

      The JCS' Authorities Are Not Supportive . . . . . . 16

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . 18

1

**TABLE OF AUTHORITIES**

2  **Cases**

3  <u>Clark v. ENZ, Inc.</u>,
          (1997) 57 Cal.App.4th 852 . . . . . . . . . . . . . . .  10
4
    <u>Katzir's Floor and Home Design Inc., v.</u>
5          <u>M-MLS.com</u>,
          394 F.3d 1143 (9th Cir., 2004) . . . . . . . 6, 7, 11-16, 19
6
    <u>Knox v. Phoenix Leasing Incorporated</u>,
7          29 Cal.App.4th 1357 (1994) . . . . . . . . . . . . . . 6-8

8  <u>McClellan v. Northridge Park Townhome Owners</u>
          <u>Association, Inc.</u>,
9          89 Cal.App.4th 746 (2001) . . . . . . . . . . . 13, 16, 17

10  <u>Motores De Mexicalli S.A. v. Superior Court of</u>
          <u>Los Angeles</u>,
11          51 Cal.2d 172 (1958) . . . . . . . . . . . . . . . 17, 18

12  <u>Stanford Hotel v. Schwind Company</u>,
          180 Cal. 348 (1919) . . . . . . . . . . . . . . . . . . 18
13
    <u>Wollersheim v. Church of Scientology International</u>,
14          69 Cal.App.4th 1012 (1999) . . . . . . . . . . . . . 6, 7

15
    **Other Authorities**
16
    Uniform Commercial Code
17
          Article 9 . . . . . . . . . . . . . . . . . . 7, 10, 16
18
    California Code of Civil Procedure
19
          Section 187 . . . . . . . . . . . . . 5-8, 10, 14, 16
20
          Section 697.520 . . . . . . . . . . . . . . 10, 11, 19
21
    <u>California Practice Guide</u>,
22          "<u>Enforcement of Judgment And Debts</u>"
23          (Para., 6:230) . . . . . . . . . . . . . . . . . . . . 10

24

25

26

27

28

# I.

## INTRODUCTION

### Procedural History of This Docket

On February 20, 2007, this Honorable Court entered a default judgment in the amount of $2,716,358.50 in favor of plaintiffs, the present judgment creditors ("JCS") (Docket ("Dkt.") No. 99, Second Request to Take Judicial Notice ("2RTJN"), Ex. No. 1).

The parties to the CV 02-7042 RSWL proceeding are plaintiffs, the JCS, and four (4) defendants: (1) Passport Video, "...a business of unknown form and origin," (2) Passport International Productions Inc., ("PASSPORT-NJ"), (3) Passport International Productions of California, Inc., ("PASSPORT-CA"), and (4) Dante J. Pugliese ("PUGLIESE") (November 3, 2006 default by clerk, 2RTJN Ex. No. 3).

PASSPORT-NJ was the operational company from its commencement on August 25, 1989 until 1998, and was succeeded by PASSPORT-CA formed in 1998 upon relocation of the principal activities of PASSPORT-NJ to California, with PASSPORT-CA being the successor in interest to the assets of PASSPORT-NJ (Dec. of JP, Para. 7).

On September 9, 2002, plaintiffs sued the four defendants for infringement of certain property rights in an Elvis Presley documentary (Dkt. No. 1).

On October 23, 2002, the Court granted a preliminary injunction (Dkt. No. 36). On November 25, 2002, defendants filed a Notice of Appeal of the preliminary injunction (Dkt. No. 44). On November 22, 2005, the Court granted plaintiffs motion for summary

1  judgment apparently as to liability (Dkt. No. 74).

2        On April 27, 2006, the Court ordered a Status Conference

3  for May 15, 2006 (Dkt. No. 77).  On May 15, 2006, the Court

4  continued the Status Conference to June 12, 2006 (Docket No. 78).

5  On June 12, 2006, the Court ordered Plaintiffs to proceed with the

6  case (Docket No. 79).

7        By stipulation for entry of an Order of <u>October 25, 2006</u>,

8  counsel for both plaintiffs and the four defendants (2RTJN, Ex. No.

9  2), notified the Court that:

10            "...Defendants do not intend to defend
              themselves at the damages trial in this matter.
11            In order to spare the parties and this Court
              the time and expense of preparing for a trial,
12            in which Defendants will not participate,
              Defendants have agreed to stipulate to entry of
13            default against Defendants in connection with
              the damages trial in this matter...." (2RTJN,
14            Ex. No. 2 at 2:8-15).

15        On October 25, 2006, the Clerk entered default as to the

16  four defendants "Pursuant to stipulation and order dated

17  10/25/2006" (Docket No. 84).

18        On December 19, 2006, plaintiffs filed numerous

19  declarations (Dkt. Nos. 85-94) in support of their motion for

20  attorneys fees and costs in the amount of <u>$304,206.83</u>, and a

21  Request for Default Judgment in the amount of <u>$2,435,000.00</u>.  As

22  stated, on February 20, 2007, the Court entered a damages judgment

23  in the amount of <u>$2,435,000.00</u> and a fees and cost award in the

24  amount of <u>$304,206.83</u> (Dkt. Nos. 99 and 100).

25  **<u>The UCC Florence Pugliese Perfected Secured Creditor</u>**

26  **<u>Interest And Foreclosure Sale</u>**

27        While the case was pending, on April 26, 2006, pursuant

28  to two (2) UCC-1 recorded financing statements (Exs. Nos. 3 and 4

1  to the declaration of Allen Hyman ("Dec. of AH"), Exs. Nos. 3 and 4

2  to the declaration of Jeanette Pugliese ("Dec. of JP")): (1) "...

3  August 24, 2001 No. 012460158..." and (2) "...April 3, 2006 06-

4  70649491...," in the amount of $3,403,117.74 secured by "...all of

5  the assets of Passport International Productions of California

6  Inc., and Passport International Productions Inc....," and after

7  notices of default (Exs. Nos. 5, 6 and 7 to the Dec., of JP), and

8  April 18, 2006,  Publication of Notice of Foreclosure Sale, (Ex. No

9  6 to the Dec., of Allen Hyman), Florence Pugliese conducted a

10  public sale of the "collateral," of the two Passport defendants.

11       No one appeared at the <u>April 26, 2006</u>, public sale (Dec.

12  of JP; Dec. of AH), and Florence Pugliese who asserted a secured

13  debt in the amount of $3,403,117.74 purchased the Passport

14  collateral.

15       On April 13, 2006, Florence Pugliese with her

16  granddaughter Jeanette Pugliese had formed Passport International

17  Entertainment, L.L.C., ("PIE-LLC").  After the April 26, 2006

18  foreclosure sale, Jeanette Pugliese, on behalf of Florence

19  Pugliese, through PIE-LLC commenced to exploit the assets purchased

20  at the April 26, 2006 foreclosure sale through PIE-LLC.

21       Florence Pugliese's August 24, 2001, and Florence

22  Pugliese's April 3, 2006 ("06-70649491")  California Uniform

23  Commercial Code filings, identifying the PASSPORT-CA collateral as

24  security for the <u>$3,403,117.74</u> debt owed to Florence Pugliese, were

25  public record and a matter of actual and constructive notice to the

26  plaintiffs (JCS), (as was the April 26, 2006 Foreclosure):

27       (1)  Three months prior to the June 12, 2006 Status

28  conference (Dkt. No. 79);

1          (2)   Six months prior to the October 25, 2006 Stipulation

2 for entry of default (Dkt. No. 84);

3          (3)   Nine months prior to the December 19, 2006 Notice of

4 Motion and supporting declarations (Dkt. Nos. 85-94) for an entry

5 of default judgment; and

6          (4)   Eleven months prior to the February 20, 2007 entry

7 of Judgment (Dkt. No. 99).

8        **The JCS' Assertion of Successor Corporate Liability**

9          The JCS assert (Memo., at 4:16-19 and 4:22-5:3) that PIE-

10 LLC should be added to the judgment under California Code of Civil

11 Procedure ("CCP") §187, under the doctrine of "successor corporate

12 liability" (Notice at 2:26).

13          The JCS assert factually that:

14             "...Florence Pugliese (the 92-year old mother
              of Judgment Debtor Dante Pugliese, who another

15             court has found to have defrauded his
              creditors) came out of nowhere to 'foreclose'

16             on the assets of the Passport Debtors...."
              (Memo., at 4:16-19).

17

18          The JCS' sentence reads improperly in that Florence

Pugliese has not been found by any court to have defrauded

19 creditors (Memo. at 4:16-19).  To the contrary, the "other court's"

20 Amended Statement of Decision (RTJN Ex. No. 1) is consistent with

21 FP's and PIE-LLC's assertions in opposition to this motion.  The

22 JCS also assert:

23
             "This was a fraud.  Inadequate consideration,

24             fake 'written agreements,' and incredibly,
             Judgment Debtors now take the position that all

25             of their assets have just been 'placed' in
             Passport LLC (wherever that means).

26             Essentially, Judgment Debtors argue that all of
             their assets are now beyond the reach of any of

27             their creditors...." (Memo. at 4:22-5:3).

28          Contrary to the JCS' assertion the "Judgment Debtors"

1  take no position and have not in any manner responded to the JCS'

2  motion.   It is Florence Pugliese and her company, PIE-LLC, who are

3  the respondents who contend that CCP §187 is not applicable.

4        As well, based upon the declaration of Robert Williscroft

5  (a paralegal of the adverse party, and a person who financed the

6  adverse underlying litigation in state court), the JCS assert that:

7         1.   "...the purported loan agreements were
            never produced in the underlying family law
8           proceedings (trial was held in August 2005),
            which in turn raise the specter that these
9           documents were forged...." (See Dec. of RW,
            RTJN Ex. No. 10). (Memo. at 14:15-17).
10
          2.   "...What we have here is that right before
11          trial in April 2006 there was a concerted
            attempt to put all of the assets of the
12          Passport Judgment Debtors beyond the reach of
            the Judgment Creditors ... by attempting to put
13          all of Passport CA's assets in the hands of a
            92 year old former telephone operator who
14          allegedly owned 100% of both of these Judgment
            Debtors..." (Memo. at 17:15-20).
15
                   **The Motion Should (Must) Be Denied**
16
         Following the controlling authorities of: (1) <u>Katzir's</u>
17
   <u>Floor and Home Design Inc., v. M-MLS.com</u>, 394 F.3d 1143 (9th Cir.,
18
   2004); (2) <u>Wollersheim v. Church of Scientology International</u>, 69
19
   Cal.App.4th 1012, 1017 (1999); and (3) <u>Knox v. Phoenix Leasing</u>
20
   <u>Incorporated</u>, 29 Cal.App.4th 1357 (1994), and the evidence
21
   presented by Florence Pugliese: (1) in the declaration of Jeanette
22
   Pugliese as to the financial history of Florence Pugliese's loans
23
   and wealth; (2) in the deposition testimony of Florence Pugliese
24
   (summary presented) (deposition transcripts authenticated by the
25
   Dec., of AH); and (3) the December 1, 2005 Amended Statement Of
26
   Decision ("ASOD") of the Honorable Judge Kalin, the JCS have not as
27
   a matter of fact (and could not) as a matter of law meet their
28

1  burden of proof for the Court to find "successor liability,"

2  pursuant CCP §187.

3          The motion is legally and factually deficient in that

4  Wollersheim, supra at 1017 requires that a motion to amend a

5  judgment to add an additional party under CCP §187 requires that

6  the moving party establish the factual elements required by "a

7  preponderance of the evidence."  The JCS have not established any

8  fact by a preponderance of the evidence.

9          The motion is legally deficient in that Katzir's Floor

10 and Home Design, supra at 1151, specifically holds that successor

11 liability cannot apply in this circumstances in that PIE-LLC is not

12 the successor for purposes of CCP §187 in that the assets of

13 PASSPORT were purchased at foreclosure sale by Florence Pugliese

14 and PIE-LLC as a matter of law is not the successor entity.

15          The motion is legally deficient in that as the California

16 Appellate Court held in Knox v. Phoenix, supra:

17              "...According to the California Uniform
                Commercial Code, (FP's) execution of a security
18              agreement describing the property covered gave
                (FP) a security interest in that collateral (§§
19              9203, subd. (1), 9402, subd. (1)).  (FP)
                perfected that security interest when (FP)
20              filed a financing statement with the Secretary
                of State (§§ 9302, subd. (1), 9401, subd. (c)).
21              (FP) thus acquired priority over other
                (PASSPORT) creditors (§§ 9201, 9301, 9312,
22              subds. (3)-(5)), including the right to take
                possession and sell the collateral if
23              (PASSPORT) defaulted (§§ 9503, 9504, subd.
                (1)).  It being undisputed that (FP) complied
24              with all of these steps." Knox, supra at 1360.

25          UCC Article 9 also compels a different conclusion (than

26 that asserted by the JCS):

27              "...(FP) complied with statutory provisions
                intended to immunize secured creditors from
28              such claims in all but the rarest of cases.  As

S:\PC7\Pugliese\Elvis\OppMotionAmend-112507.wpd                7

1        this is not that sort of case, the equitable
        impulse for restitution must yield to the
2        Legislature's command...." Knox, supra at 1368.

3        To find successor liability, the JCS must establish two

4 facts by a preponderance of the evidence: (1) that PIE-LLC is a

5 successor entity as defined under CCP §187; and (2) FP purchased

6 the assets of PASSPORT for inadequate consideration.

7        The JCS first assert that FP is a "mere telephone

8 operator," "that she came out of nowhere," "that the security loan

9 agreements are fraudulent...," and "that the debt owed to FP by

10 PASSPORT was fraudulent..."

11        Yet the declaration of Jeanette Pugliese establishes with

12 complete detail, the 1993 to June, 2005 history of Florence

13 Pugliese's loans to the two Passport entities, (Dec. of JP, Para.

14 14) which details $4,611,649.22 in loans by Florence Pugliese to

15 the Passport Entities during 1993 to June, 2005, supported by

16 yearly schedules (even numbered exhibits 1640 to 1644), supported

17 by specific documentation for each year of funds received by the

18 Passport Entities from or by Florence Pugliese.  And attached to

19 the declaration of JP (Ex. 1700) is the accounting ledger of

20 PASSPORT which verifies the debt to Florence Pugliese as of April,

21 2006.  The JCS cannot and do not refute this evidence, nor can

22 they.

23        The declaration of Jeanette Pugliese also establishes the

24 authentication of the security loan agreements of 1996 and 1998

25 (Dec. of JP, Paras. 34-38), and establishes the perfection of the

26 Florence Pugliese security interests (Dec. of JP, Paras 37 and 38).

27 (Dec. of AH, Exs. 3 and 4).

28        The totality of the alleged contrary evidence by the JCS

1   is that a paralegal of the law firm, who reviewed over 120 boxes of

2   documents, in a State Court action, does not recall seeing the two

3   loan security agreements.  Yet the UCC-1 filings are a matter of

4   public record and the JCS were on constructive notice of their

5   filings as of April, 2006, after which the JCS proceeded with the

6   litigation, in October, 2006, and December, 2006, with Florence

7   Pugliese's UCC filings a matter of public record.

8           The other evidence presented by the JCS is "excerpts"

9   from the deposition of Florence Pugliese, (presented as if the

10  questions and answers were sequential, though they were not).  As

11  set forth in the summary of the depositions of Florence Pugliese,

12  the actual sequential testimony is consistent with the existence of

13  a $4 million dollar debt, consistent with the Florence Pugliese

14  accumulated wealth, consistent with the existence of security

15  agreements, and Florence Pugliese's right to foreclose.

16          **The Passport Balance Sheet And Income Statement**

17          The JCS reference a 2005 balance sheet where there are

18  $6.68 million in assets listed, there are also $1.47 million in

19  current liabilities, long term liabilities of $6.1 million, and a

20  negative capital of $1 million, which operates to balance the

21  books. (Ex. 7, moving parties' RTJN, at 292).

22          PIE-LLC suggests to the court that it is rare indeed that

23  one determines value by an inspection of the first half of a

24  balance sheet (that of assets), and does not consider the

25  liabilities and capital.  Particularly when the principal capital

26  consists of videos which are placed on the books (including the

27  Elvis Video, cost close to $2 million), as cost of production which

28  are amortized.

1    The income statement for 2005 (Ex. 7, JCS' RTJN at 293),

2 shows a loss of $511,000.00 on sales of $4.7 million.  Even were

3 one to add back in amortization expense the total income would be

4 $350,000.00.

5    Successor liability based upon "inadequate consideration"

6 appears to arise only in the context of a private non-UCC sale.

7 CCP §187 does not appear applicable to a public UCC Article 9

8 foreclosure sale, in which a creditor has perfected its security

9 interest in compliance with the provisions of the UCC in which

10 challenges to UCC public sales are provided by state court actions.

11 Clark v. ENZ, Inc., (1997) 57 Cal.App.4th 852.

12                    **Constitutional Deficiency**

13    In this regard, Florence Pugliese asserts a more

14 fundamental defect in the JCS' motion.  The UCC Chapter Nine

15 specifically provides the legal basis where a creditor (in this

16 regard FP) may perfect a security interest in collateral (assets of

17 the debtor) as security for FP's loans. CCP §697.520.

18    Yet more to the point, Florence Pugliese's pre-existing

19 perfected security interest has priority over a second in time

20 judgment.

21    A judgment creditor, in this case the JCS, may perfect a

22 judgment lien on personal property ("JLPP") by filing a judgment

23 lien with the Secretary of the State of California. CCP 697.520,

24 California Practice Guide, "Enforcement of Judgment And Debts"

25 (Para., 6:230).

26    California Code of Civil Procedure §697.590(b) however

27 provides:

28        "...Except as provided in subdivisions (d) and

1    (e) priority between a judgment lien on persons
      property and a conflicting security interest in
2    the same personal property shall be determined
      according this subdivision.  <u>Conflicting</u>
3    <u>interests rank according to priority in time of</u>
      <u>filing or perfection....</u>" (emphasis added).

4        Pursuant to CCP §697.590(b), Florence Pugliese's

5    perfected secured interest has priority over the JCS, who would

6    have had to have filed a JLPP with the Secretary of State to even

7    assert a lien on personal property which the JCS have not yet

8    filed.  Yet the JCS come to this court seeking to have this court

9    determine priority of a judgment lien they have not perfected, in

10   the JCS' favor, as against a pre-existing perfected lien that is

11   prior in time of Florence Pugliese.

12                                II.

13   <u>THE NINTH CIRCUIT'S HOLDING IN KATZIR'S FLOOR AND HOME DESIGN INC.,</u>

14   <u>V. M-MLS.COM., 394 F.3D 1143 (9TH CIR., 2004), IS CONTRARY TO THE</u>

15                        <u>JCS' MOTION</u>

16       In <u>Katzir's</u>, <u>supra</u>, the facts were similar to that

17   presented in this case:

18       1.   M-MLS ("M-MLS") was a Canadian corporation wholly

19   owned by Peter Sommer ("SOMMER").  In 1998 or 1999, M-MLS sold a

20   "...machine to KATZIR ... for $87,200.00 in "as is" condition." <u>Id.</u>

21   at 1146.

22       2.   KATZIR asserted the machine did not work and on July

23   29, 1999, sued M-MLS in California state court, (later removed to

24   federal court on the basis of diversity). <u>Id.</u> at 1146.

25       3.   M-MLS "...initially answered and defended..." <u>Id.</u> at

26   1146.

27       4.   Confronting financial difficulties, defendant M-MLS

28

1  "...borrowed $50,000 from its former accountant FROMSTEIN, and on

2  August 28, 2000 provided FROMSTEIN <u>a secured interest in all of M-</u>

3  <u>MLS Inc.'s assets.</u>" (emphasis added) <u>Id.</u> at 1147.

4       5.   In December, 2000, defendant M-MLS "...discharged

5  its attorneys and ceased defending the lawsuit." <u>Id.</u> at 1147.

6       6.   On March 9, 2001, "...the Court entered default

7  against M-MLS and on March 9, 2001 the court entered a default

8  judgement (in favor of KATZIR) of $1,638,884...." <u>Id.</u> at 1147.

9       7.   M-MLS failed to make payments to its creditor

10 FROMSTEIN and in June, 2001, "...FROMSTEIN initiated private

11 involuntary receivership proceedings under Canadian law (SALAR

12 RECEIVERS being the receiver)." <u>Id.</u> at 1147.

13       8.   On July 9, 2001, SALAR RECEIVERS "sold all of the

14 assets of M-MLS to Scamper Enterprises Inc., a separate corporation

15 wholly owned by SOMMER's (the initial 100% owner of M-MLS) wife for

16 $25,000.00." <u>Id.</u> at 1147.

17       9.   "...KATZIR was given notice and was aware of the

18 receivership proceedings in Canada but did not challenge the

19 valuation of the sale to Scamper of all of M-MLS assets...." <u>Id.</u> at

20 1147.

21       10.  "...Around the time that M-MLS discharged its

22 attorney in December, 2000, SOMMER (the owner of M-MLS) formed

23 another Canadian corporation called M-MLS.com an online brokerage

24 company ..." After SCAMPER (owned by SOMMER's wife) bought the

25 asset of M-MLS Inc., Scamper "...allowed M-MLS.com to use the M-MLS

26 website Scamper had acquired as part of the receiver's sale." <u>Id.</u>

27 at 1147.  The same circumstance is presented by the JCS in

28 asserting that Florence Pugliese's use of intellectual property

1  assets she purchased establishes successor liability, which is

2  without basis.

3        11.  In May, 2000, plaintiff KATZIR "...moved to modify

4  the federal court default judgment to reflect the true names of the

5  debtor by adding Sommer as an individual and M-MLS.com." Id. at

6  1147.

7        12.  The district court "...granted the motion on the

8  bases that Sommer was the alter ego of M-MLS. INC., and (that) ...

9  M-MLS.com was the successor corporation of (initial defendant of)

10 MLS, Inc...." Id. at 1147.

11       Though the Ninth Circuit in M-MLS, supra reversed the

12 finding of alter ego, M-MLS, supra at 1148-1150, PIE-LLC

13 respectfully directs this Court's attention to the only issue

14 presented in by the JCS that of "successor corporate liability,"

15 (found at M-MLS, supra at 1150-1151).  In evaluating successor

16 corporate liability under the circumstances before it, the Ninth

17 Circuit found:

18       1.  The Circuit acknowledged the doctrine of "successor

19 corporate liability," identifying McClellan v. Northridge park

20 Townhome Owners Assoc., supra (identified by JCS). Id. at 1150.

21       2.  The Circuit found in a review of California

22 appellate authorities that "...although the California Supreme

23 Court in Ray listed the two additional factors in the disjunctive,

24 all of the cases cited by the Supreme Court involved inadequate

25 consideration.  Inadequate consideration is an 'essential

26 ingredient' to a finding that one entity is a mere continuation of

27 the other. (Citing to) Maloney v. Am. Pharm Co. 207 Cal.App.3d 282,

28 255 Cal.Rptr. 1, 4 (1988)." Id. at 1150.

1    3.    The Circuit found that the district court

2  erroneously found successor liability (based upon similar theories

3  as the JCS contend here) in that: "...The district court relied on

4  the transfer of the website and intellectual property to Scamper to

5  support its finding of inadequate consideration." Id. at 1150.

6    4.    The circumstances before this court was that of a

7  foreclosure by secured creditor Florence Pugliese and a transfer of

8  assets from PASSPORT-CA to Florence Pugliese by way of an April 26,

9  2006 foreclosure sale.

10    5.    In M-MLS, supra, the Ninth Circuit, in finding the

11  district court's ruling was erroneous as to successor liability,

12  first found:

13           (a)   "...First the transfer was to Scamper
             (though owned by the wife of the owner of M-
14           MLS), an intervening corporation, not to M-
             MLS.com. See Maloney, 255 Cal.Reporter at 4 ...
15           (A) mere continuation contemplates a direct
             sale of asset from the predecessor corporation
16           to the successor corporation." M-MLS, supra at
             1151.
17
             (b)   The Ninth Circuit first finds that there can be no
18
     successor liability in that M-MLS.com is not in fact the successor
19
     for purposes of CCP §187 to M-MLS, in that the assets were
20
     purchased at a foreclosure sale by SCAMPER.
21
             (c)   In this regard, the ELVIS plaintiffs, the JCS,
22
     though attempting to belittle and cast doubt on Florence Pugliese's
23
     ownership of PASSPORT-CA, attempting to cast doubt on Florence
24
     Pugliese's wealth accumulation as "a mere telephone operator...,"
25
     attempting to cast doubt on the loans of Florence Pugliese to the
26
     PASSPORT entities, "...the notes were a fraud...," do not in any
27
     manner seek successor liability as to Florence Pugliese, though the
28

1  ELVIS plaintiffs and the JCS assert that all of Florence Pugliese's

2  debts, secured interests, and other rights are suspect.

3          (d)  Florence Pugliese was the successor owner of the

4  PASSPORT-CA assets, not PIE-LLC.

5          (e)  The ELVIS plaintiffs seek "successor liability"

6  against a non-successor, M-MLS, supra at 1151, which the Ninth

7  Circuit finds is not legally viable.

8          (f)  The Ninth Circuit also held:

9          "...Second even if Scamper's subsequent grant
            of permissive use of the website to M-MLS.com
10          could somehow make M-MLS.com the successor
            corporation of M-MLS Inc., (a proposition of
11          highly dubious merit), Katzir's Floor has
            failed to establish that the transfer to
12          Scamper involved inadequate consideration." M-
            MLS, supra at 1151.

13
            "...See Id. at 3.n.3 (holding that the party
14          asserting the theory of successor liability
            bears the burden of establishing inadequate
15          consideration)..." M-MLS, supra at 1151.

16          (g)  "...No evidence as of its value was introduced, and

17  there are no facts in the record to support the district court's

18  conclusions that M-MLS's Inc. trainer of its website and

19  intellectual property to Scamper satisfied the requirement that the

20  trainer involved inadequate consideration." M-MLS, supra at 1151.

21                  **Sale Of Assets Of PASSPORT-CA**

22          The assets of PASSPORT-CA, the collateral was purchased

23  by Florence Pugliese for the value of her debt that being $3.4

24  million.

25          **Further Basis Consistent With Ninth Circuit Decision**

26                          **In M-MLS, supra**

27          PIE-LLC asserts that there is a further defect to the

28  JCS' attempt to assert successor liability, consistent with the

1  Ninth Circuit decision in M-MLS, supra.  In M-MLS, supra,

2  FROMSTEIN, the accountant to M-MLS, loaned M-MLS $50,000.00 in

3  which M-MLS provided FROMSTEIN a security interest in the assets of

4  M-MLS.  FROMSTEIN then foreclosed on the assets which were sold at

5  a receiver's sale, providing FROMSTEIN some return, $25,000.00 on

6  his secured loan.

7       In the circumstance presented in this matter, it is

8  Florence Pugliese who has loaned PASSPORT-CA $3.4 million, who

9  forecloses and purchases the assets.  The JCS would have the court

10 through finding successor liability nullify Florence Pugliese's

11 debt, her secured creditor position, her perfection of her secured

12 creditor position, taking a property right from Florence Pugliese

13 through a CCP §187 procedure, not only without substantial

14 evidence, not only contrary to the great weight of the evidence in

15 Florence Pugliese' favor, but contrary to the specific remedies

16 provided by Commercial Code Article 9, if Florence Pugliese's

17 secured and perfected interest and sale are to be challenged.

18              **The JCS' Authorities Are Not Supportive**

19      The JCS' "Appendix of California Authorities," two (2)

20 citations, are not supportive, the first being McClellan v.

21 Northridge Park Townhome Owners Association, Inc., 89 Cal.App.4th

22 746 (2001), in which the Court found:

23      1.   On October 10, 1966, Peppertree Condominium

24 Association ("PEPPERTREE"), entered into a contract with plaintiff

25 MCCLELLAN "...to perform earthquake repair work on the ...

26 PEPPERTREE ... 76 unit condominium complex..." Id. at 749.

27      2.   After the work was completed, PEPPERTREE did not

28 pay. Id. at 749.

1       3.   MCCLELLAN commenced arbitration proceedings, where

2   the arbitrator "...awarded MCCLELLAN a default arbitration award

3   ... which ... on June 15, 1998...," the Superior Court "confirmed

4   in the amount of $171,685.56..." Id. at 749.

5       4.   On June 2, 1998, the board of directors of

6   PEPPERTREE filed "...articles of incorporation for Northridge Park

7   Townhome Owners Association...," ("NORTHRIDGE"), and "...on July 2,

8   1998, PEPPERTREE filed a voluntary petition under chapter 7 for

9   Bankruptcy." Id. at 750.

10      5.   On April 14, 1999, the Bankruptcy Court dismissed

11  PEPPERTREE's bankruptcy petition. Id. at 750.

12      6.   MCCLELLAN filed a motion to "...amend the judgment

13  to add Northridge Park as a judgment debtor...." asserting that

14  Northridge Park was "...merely a continuing of PEPPERTREE ...

15  created to hinder delay and defraud PEPPERTREE's creditors." Id. at

16  751.

17      7.   The Court found that the PEPPERTREE's CC&Rs provided

18  that "...the declaration run with the land for fifty years ...

19  unless revoked by ... not less than three-fourths (3/4) of the

20  condominiums ... There is no evidence that PEPPERTREE's CC&R's had

21  been duly revoked...." Id. at 755.

22      8.   The Court also found that there was no transfer of

23  rights in the individual units to the new association, Id. at 756,

24  and that "...Northridge Park is essentially nothing more than the

25  continuation of PEPPERTREE under a different name...." Id. at 755.

26      Yet here, there is no evidence of a lack of valid

27  transfer.

28      The second authority cited by the JCS is Motores De

1  <u>Mexicalli S.A. v. Superior Court of Los Angeles</u>, 51 Cal.2d 172

2  (1958).

3          Yet in <u>Motores</u>, <u>supra</u>, the Appellate Court denied the

4  petition, finding that the persons which the judgement creditor

5  requested to be added "Resnick and the Cowans would constitute a

6  denial of due process of law." <u>Id</u>. at 176.  The Court held that

7  "...To summarily add Resnick and the Cowans to the judgment

8  heretofore running only against Erbel, Inc., without allowing them

9  to litigate any question beyond their relationship to the alleged

10 alter ego corporation would patently violate their constitutional

11 safeguard...." <u>Id</u>. at 176.

12         The JCS final authority is <u>Stanford Hotel v. Schwind</u>

13 <u>Company</u> 180 Cal. 348 (1919), which is not supportive in that it

14 holds that under certain circumstances a court in equity "...will

15 regard the new corporation as a continuation of the former

16 corporation and will hold it liable for the debts of the former

17 corporation..." <u>Id</u>. at 354.

18                            **III.**

19                        <u>**CONCLUSION**</u>

20         The preponderance of the evidence (summary of the

21 deposition of Florence Pugliese, (age 89) Vol. 2, and findings in

22 the ASOD, and the Dec. of JP), establishes that Florence Pugliese

23 accumulated considerable wealth, and during 1993 to June, 2005,

24 loaned that wealth in the amount of $4.5 million to the Passport

25 entities.  The JCS have no evidence to the contrary.

26         The preponderance of the evidence (Dec., of JP and

27 deposition of Florence Pugliese, (age of 89)) establish the

28 existence of security loan agreements.  And the JCS have no

1  evidence to the contrary, other than a paralegal who claims not to

2  have observed them in a review of 125 boxes of documents, in a

3  prior case.

4          The filing of the UCC-1 is prima facie evidence of the

5  existing secured debt of Florence Pugliese, which the JCS had

6  constructive notice, and there is no evidence to the contrary.

7          PIE-LLC is not the successor entity of Passport, M-

8  MLS.com, supra at 1151, Florence Pugliese was the successor in

9  interest to the assets of Passport.

10         The preponderance of the evidence is that the $3.4

11  million is sufficient consideration, and the JCS have not indicated

12  to the contrary.  More to the point is that the JCS' motion would

13  operate to defeat the security interest of FP, which can only be

14  attached by a state court proceeding asserting improper sale under

15  UCC Chapter 9.

16         The JCS by comparing websites of the former Passport and

17  the PIE-LLC website have established nothing more than the use of

18  the assets purchased by Florence Pugliese.

19         Pursuant to CCP §697.520, Florence Pugliese's rights are

20  superior to that of the JCS, and the JCS have not established by a

21  preponderance of the evidence to the contrary.  The motion should

22  be denied.

23                              Respectfully Submitted,

24                              LAW OFFICES OF ALLEN HYMAN

25

26  DATED: November 29, 2007      By:   /s/ Allen Hyman, Esq.
                                        Allen Hyman
27                                      Attorneys for Respondent,
                                        PASSPORT INTERNATIONAL
28                                      ENTERTAINMENT, LLC

1 | ALLEN HYMAN, ESQ. (CBN: 73371)
CHRISTINE COVERDALE, ESQ. (CBN: 195635)
2 | LAW OFFICES OF ALLEN HYMAN
10737 Riverside Drive
3 | North Hollywood, California 91602
(818) 763-6289 or (323) 877-3405
4 | Fax: (818) 763-4676

5 | Attorneys for Respondent,
PASSPORT INTERNATIONAL ENTERTAINMENT, LLC
6

*Declaration of Jeanette Pugliese*

7

8 |                 **UNITED STATES DISTRICT COURT**

9 |                 **CENTRAL DISTRICT OF CALIFORNIA**

10

11 | ELVIS PRESLEY ENTERPRISES, INC., )   Case No. CV 02-7042 RSWL (RZx)
et al.,                            )
12 |                                )   **DECLARATION OF JEANETTE**
                   Plaintiffs,     )   **PUGLIESE IN OPPOSITION TO**
13 |                                )   **MOTION TO ADD PASSPORT**
v.                                 )   **INTERNATIONAL ENTERTAINMENT,**
14 |                                )   **LLC TO THE JUDGMENT**
PASSPORT ENTERTAINMENT, et al.,    )
15 |                                )   **Date:  December 13, 2007**
                   Defendants.     )   **Time:  10:00 a.m.**
16 |                                )   **Place: Courtroom 21, the**
                                   )          **Honorable U.S. District**
17 |                                )          **Court Judge Ronald S.W.**
                                   )          **Lew, presiding**
18 | _____)

19

20 |        I, Jeanette Pugliese, declare as follows:

21 |        1.   I have personal knowledge of the facts set forth

22 | in this declaration, and I could and would testify as to these

23 | facts if called upon to do so.

24 |        2.   I am the daughter of Dante Pugliese, and the

25 | granddaughter of Florence Pugliese.

26 |        3.   I was a defendant in the California State Court

27 | lawsuit of <u>Michelle Noel Pugliese v. Florence Pugliese</u>, Case No. BD

28 | 367868.

-1-

1    4.   In 1986, I received my accounting degree from Seton
2  Hall University.

3    5.   In 1994, I became the controller of Passport
4  International Productions, Inc., a New Jersey corporation.  Since
5  its inception in 1998, I was the controller of Passport
6  International Productions of California, Inc., until the cessation
7  of its operations in 2006.

8    6.   I am familiar with the financial books and records
9  of Passport International Productions, Inc., a New Jersey
10  corporation, and Passport International Productions of California,
11  Inc., a California corporation.

12    7.   Up to 1998, during the operation of Passport
13  International Productions, Inc., and during the operation of
14  Passport International Productions of California, Inc., a
15  California corporation, I was the principal person in charge of
16  establishing and maintaining the accounting and business records of
17  these two companies.

18    **Funds Loaned And Invested By Florence Pugliese**

19    8.   The business records of both Passport of New Jersey
20  and Passport of California, consist of computer accounting files,
21  comprised of entries regularly made at the time of the transaction,
22  in the ordinary course of business.  As to both companies, receipts
23  of either income or funds from any source were inputted into the
24  Passport accounting records on the day the funds were received, and
25  records of expenditures by the Passport entities were inputted into
26  the Passport accounting database on the day funds were expended.

27    9.   I was the supervisor in charge of maintaining the
28  accounting records at Passport of New Jersey and Passport of

-2-

S:\PC7\Pugliese\Elvis\Dec-JP-OppMotion-112707.wpd

1 | California.

2 | 10. For the California State Court trial in _Michele_

3 | _Pugliese vs. Florence Pugliese_, Case No. BD367868 I compiled yearly

4 | summaries from the Passport of New Jersey and the Passport of

5 | California accounting data bases, identifying funds loaned by

6 | Florence Pugliese to both Passport of New Jersey and Passport of

7 | California.

8 | 11. In the California State case of _Michele Pugliese vs._

9 | _Florence Pugliese_, I prepared schedules of Florence Pugliese loans

10 | to the Passport entities as Exhibit Nos., 1639 to Exhibit No. 1664.

11 | 12. I created the exhibits in the California State case

12 | and compiled the documentation which supported the schedules of

13 | funds loaned by Florence Pugliese to the Passport companies. I

14 | have created exhibits I derived from the exhibits in the California

15 | State case and included these schedules with the same documentation

16 | I presented in the State Court case, which I attach to this

17 | declaration. In this declaration I use the same exhibit numbers

18 | that I used in the California State Case.

19 | 13. I attach to this declaration as Exhibit No. 1639

20 | (Bates 20), a summary listing, derived from the accounting files of

21 | Passport of New Jersey and Passport of California, of the loans

22 | made by Florence Pugliese to the two Passport companies by year

23 | during the period 1993 to June, 2005. The sum of the total amount

24 | listed by year is $4,611,649.22.

25 | 14. I set forth below the same summary that is found on

26 | Exhibit No. 1639 (Bates 20), which identifies the loans of Florence

27 | Pugliese to Passport for each year, 1993 to June, 2005. I also

28 | identify below the separate yearly totals of funds loaned by

-3-

1  Florence Pugliese to either of the Passport entities, with yearly
2  totals of the loans and a listing of the specific loans identified
3  on separate yearly exhibits.

## SUMMARY OF CASH RECEIPTS JOURNAL CONTRIBUTIONS AND LOANS

## BY FLORENCE PUGLIESE TO PASSPORT-NJ AND PASSPORT-CA

### PASSPORT-NJ

| Exhibit #            | Year | Florence Pugliese |
|----------------------|------|-------------------|
| 1640 (Bates 21)      | 1993 | 61,729.46         |
| 1642 (Bates 29-30)   | 1994 | 290,127.52        |
| 1644 (Bates 60-61)   | 1995 | 127,617.86        |
| 1646 (Bates 84)      | 1996 | 356,223.68        |
| 1648 (Bates 105)     | 1997 | 1,496,483.86      |

### PASSPORT-CA

| Exhibit #            | Year | Florence Pugliese |
|----------------------|------|-------------------|
| 1650 (Bates 130-131) | 1998 | 212,364.43        |
| 1652 (Bates 168-169) | 1999 | 177,964.37        |
| 1654 (Bates 188-189) | 2000 | 677,809.75        |
| 1656 (Bates 221)     | 2001 | 83,009.95         |
| 1658 (Bates 235-236) | 2002 | 357,936.59        |
| 1660 (Bates 252)     | 2003 | 114,336.58        |
| 1662 (Bates 273)     | 2004 | 498,656.27        |
| 1664 (Bates 301-302) | 2005 | 157,388.90        |
| TOTAL:               |      | 4,611,649.22      |

22      15.  During the period 1993 to 2005, Passport provided
23  some funds to Florence Pugliese which offset certain of the loans
24  provided by Florence Pugliese to Passport, with the total owing to
25  Florence Pugliese as of April, 2006, of $3,403,117.14.

26      16.  As Florence Pugliese's granddaughter and accountant
27  since 1989, I have assisted Florence Pugliese with her financial
28  affairs on a regular basis.  I am aware that the source of Florence

-4-

1  Pugliese's funds have come from sale of real property, from sale of

2  stocks that she has had in her name for many years, and income from

3  catalogs of music.

4          17.  As identified above, and below I attach as Exhibit

5  Nos. 1640, 1642, 1644, 1646, 1648, 1650, 1652, 1654, 1656, 1658,

6  1660, 1662, and 1664, summary accountings for each year 1993

7  through June, 2005 (1640 being 1993, and 1664 being for January to

8  June, 2005), a schedule from the accounting files of Passport New

9  Jersey and Passport California, which identify the loans of

10 Florence Pugliese for each year to Passport, indicating the dates

11 of each Florence Pugliese loan for each year.

12         18.  For example, Ex. No. 1640 (Bates 21) identifies

13 loans which correlate to the amount stated for year 1993 on Ex.

14 1639 and the total on Ex. No. 1642 (Bates 29 and 30) is the amount

15 stated for year 1994 on Ex. No. 1639 (Bates 20).

16         19.  After each yearly summary, Exhibit 1642 (Bates 29

17 and 30), are backup documentation (Exhibit 1643; Bates 22-29)

18 identifying the Florence Pugliese loans to Passport of New Jersey

19 and Passport of California.

20         20.  Similarly Ex. No. 1643 (Bates 31-59) is the

21 documentation which supports the schedule for 1994 (Ex. 1642).

22         21.  For each year 1995 to 2005, I present a yearly

23 listing of the amounts provided by Florence Pugliese, identifying

24 the date of each loan and the Bates numbers of the backup

25 documentation, with the back up documentation provided in the

26 following exhibit.

27         **General Ledger-Loan Account Florence Pugliese**

28         22.  Attached to this declaration, as Exhibit No. 1700

-5-

1 (Bates 323-325), is a copy of the general ledger of Passport

2 California Account 18900 for the period January 1, 2005 to December

3 31, 2006, Account 18900, the account being "Due To From Flo

4 Pugliese." Account Number 18900 identifies the current balance

5 owned by Passport California to Florence Pugliese at any given

6 time, given Florence Pugliese's loans to Passport and Passport's

7 partial repayments to Florence Pugliese.

8       23.  Ex. No. 1700 (Bates 323-325), Account No. 18900, is

9 from the business records of Passport, maintained in the ordinary

10 course of business, and includes entries made at the time

11 indicated.

12       24.  As of May, 1, 2006, the amount owed by Passport to

13 Florence Pugliese, as identified in Exhibit No. 1700 (Bates 324),

14 was $3,403,117.74.

15              **Power of Attorney for Florence Pugliese**

16       25.  On December 5, 1997, I was appointed with a power of

17 attorney of my grandmother Florence Pugliese, which power of

18 attorney has remained in effect from December 5, 1997, to the

19 present day.  I attach to this declaration as Exhibit No. 3006, the

20 December 5, 1997, Appointment of Power of Attorney by Florence

21 Pugliese.

22              **Date of Birth of Florence Pugliese**

23       26.  I attach to this declaration as Exhibit No. 8, a

24 copy of my grandmother Florence Pugliese's Passport, which

25 indicates her date of birth as October 21, 1914.

26              **Health of Florence Pugliese**

27       27.  Florence Pugliese suffers from cardiovascular

28 disease, she has difficult breathing, and is easily exhausted, she

1   experiences dizziness, and often has chest pain.  Over the past

2   year, her general health condition appears to be deteriorating.

3   <u>**Four Million Obtained By Florence Pugliese From**</u>

4   <u>**Sale of Florence Pugliese's 1982 Purchase of Land**</u>

5   <u>**Invested In Passport**</u>

6           28.   I have investigated the financial documents of

7   Florence Pugliese.

8           29.   I attach to this declaration as Exhibit No. 1701, a

9   copy of the first and second pages of a <u>July 27, 1982</u> Florence

10  Pugliese Purchase Agreement, where Florence Pugliese purchased the

11  entirety of the 100 shares of A.P.Z., Inc., a New Jersey

12  Corporation, (Ex. No. 1703, page 2).

13          30.   I attach to this declaration as Exhibit No. 1702, a

14  copy of the Rider to the <u>July 27, 1982</u> Florence Pugliese purchase

15  of A.P.Z., Inc., in which Rider, at paragraph No. 5 (page 1 of Ex.

16  No. 1702) indicates that A.P.Z.'s assets contain "at least 70 acres

17  of land...."

18          31.   My review of Florence Pugliese's financial records

19  indicates that, in the mid to late 1980's Florence Pugliese sold

20  part of the A.P.Z. property for $1,000,000.00, and that during

21  1994-1996, I participated in Florence Pugliese selling the balance

22  of the A.P.Z. property for $2.85 million.

23          32.   I attach to this declaration as Exhibit No. 1703, a

24  copy of an <u>April 15, 1996</u> closing statement, for the sale of the

25  remaining A.P.Z. land, which indicates receipt by Florence Pugliese

26  of $2,850,000.00 for the balance of the sale.

27          33.   During 1994-1996, I monitored my grandmother's

28  Florence Pugliese's account during which time my grandmother

-7-

1  received $2.8 million dollars from the sale of her real estate in

2  New Jersey.

3          34.   In that as of 1996 Florence Pugliese was commencing

4  to loan large amounts to Passport NJ, Florence Pugliese on the

5  advice of her grandson, my brother who is an attorney, Florence

6  Pugliese entered into a security loan agreement dated November 20,

7  1996, which is attached to my declaration as Exhibit No. 15 (Bates

8  10 and 11).

9          35.   I saw the security loan agreement (Exhibit No. 1) in

10 November, 1996 when Florence Pugliese signed the agreement.

11         36.   Also given the large amounts being loaned by

12 Florence Pugliese, after the 1998 transfer of operations from

13 Passport New Jersey to Passport California, on July, 8, 1998,

14 Florence Pugliese entered into a security loan agreement with

15 Passport of California (Ex. No. 2 (Bates 12-13)).   I saw the

16 Florence Pugliese July, 1998, security loan agreement (Exhibit No.

17 2), when Florence Pugliese signed the agreement with Passport of

18 California in July 1998.

19         37.   Because the large sums loaned by Florence Pugliese,

20 Florence Pugliese commenced filing a UCC financing statement.   I

21 attach to this declaration as Exhibit No. 3 an August 24, 2001 UCC

22 Financing Statement, 0124160158, as to Passport International

23 Productions Inc., and Passport International Productions of

24 California, Inc., filed on behalf of Florence Pugliese.

25         38.   I attach to this declaration as Exhibit No. 4 an

26 April 3, 2006 "Added" "Continuation" UCC Financing Statement,

27 06-70649491, which was filed in favor of Florence Pugliese.

28                    **Events In 2005 and 2006**

1    39.   In 2005 and 2006, Passport had been losing money

2  each year and Florence Pugliese was continuing to loan Passport

3  funds, liquidating her stock assets, borrowing on her home to fund

4  Passport.   As of 2006 Florence Pugliese's loans to Passport was

5  over $3.4 million dollars with no likelihood that Passport could

6  repay any of the funds to Florence Pugliese.

7    40.   In order to attempt to salvage whatever value of her

8  investments in Passport, whichever $1 million had been capitalized

9  and over $3.4 million was provided under loan agreements, Florence

10  Pugliese's grandson, an attorney, suggested that Florence Pugliese

11  foreclose and attempt to sell Passport and obtain what funds she

12  could to plan the remaining years of her life, provide for her for

13  her last years of her life, and pass on to her grandchildren and

14  great grandchildren any assets remaining.

15    41.   I attach to my declaration as Exhibit No. 5 a March

16  31, 2006 letter of Florence Pugliese delivered to Passport of New

17  Jersey and Passport of California on March 31, 2006 requesting

18  repayment of Florence Pugliese's loan.

19    42.   I attach to my declaration as Exhibit No. 6 an April

20  14, 2006 letter of Florence Pugliese delivered to Passport of New

21  Jersey and Passport of California on April 14, 2006, indicating

22  intention to foreclose.

23    43.   I attach to my declaration as Exhibit No. 7 an April

24  24, 2006 letter of Florence Pugliese delivered to Passport of New

25  Jersey and Passport of California on April 24, 2006, indicating

26  foreclosure and sale of assets of Passport.

27  **Loans Owed To Florence Pugliese**

28    44.   As of April 24, 2006, I was aware that Passport of

-9-

1  New Jersey and Passport of California was indebted to Florence

2  Pugliese under loan agreements by the amount of $3,403,117.14

3  (Exhibit 1700), which loans had been provided by Florence Pugliese

4  to Passport of New Jersey and Passport of California over the years

5  from at least 1995 to April 24, 2006.

6  **Foreclosure Sale**

7  45.   On April 26, 2006, I attended a Foreclosure Sale

8  where the attorney for Florence Pugliese purchased the entire

9  assets of Passport of New Jersey and Passport of California.

10  46.   In that no entity or party appeared at the

11  foreclosure sale, Florence Pugliese undertook to purchase the

12  assets of Passport, and I, on her behalf, commenced to utilize the

13  assets in a company I established for Florence Pugliese, Passport

14  International Entertainment, LLC.

15  I declare under penalty of perjury under the laws of the

16  United States that the foregoing is true and correct and that this

17  declaration was executed on November 29, 2007, in North Hollywood,

18  California.

19

20                                          /s/ Jeanette Pugliese
                                            Jeanette Pugliese
21

22

23

24

25

26

27

28

-10-

S:\PC7\Pugliese\Elvis\Dec-JP-OppMotion-112707.wpd